# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SIRRANO KEITH BALDEO,** | |
| **Plaintiff,** | |
| **v.** | |
| **CITY OF PATERSON, COUNCILMAN WILLIAM MCKOY, COUNCILWOMAN RUBY N. COTTON, COUNCILWOMAN MARITZA DAVILA, COUNCILMAN MICHAEL JACKSON, COUNCILMAN DOMINGO MENDEZ, COUNCILMAN KENNETH M. MORRIS, JR., COUNCILMAN ANDRE SAYEGH, COUNCILMAN LUIS VELEZ, COUNCILMAN SHAHIN KHALIQUE, COUNCILMAN MOHAMMAED AKHTARUZZAMAN, COUNCILMAN JULIO TAVAREZ, and JOHN DOES A–Z,** | Civ. No. 18-05359 (KM) (ESK) **OPINION** |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Sirrano Keith Baldeo publishes a local newspaper and has been a frequent critic of the Paterson City Council. He alleges that the Council[1] has taken various actions against him and his newspaper. In response, he has sued the Council under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2, for violations of his federal and state constitutional rights. The Council moves for summary judgment. (DE 39.)[2] For the following reasons, the motion is **GRANTED**.

---

[1]    I refer to the remaining defendants, which include the City and individual Council members, collectively as the "Council."

[2]    Certain citations to the record are abbreviated as follows:

DE = docket entry

## I.   BACKGROUND

### A. Facts

Baldeo published a newspaper called *The New Jersey Pulse* (formerly *The Paterson Pulse*) that covered issues in Northern New Jersey. (Baldeo Dep. at 11:13–22.) He also ran a Facebook page called "The New Jersey Pulse News Opinions and Editorial." (*Id.* at 69:7–11.) In articles and posts, he described personal disputes with Councilmembers, criticized the Council, and otherwise voiced his opinions on Paterson's governance. (*E.g.*, DE 39-8.) He also attended Council meetings to air his issues. (Baldeo Dep. at 144:19–21.) What happened at three Council meetings as well as certain actions by Councilmembers form the basis for his claims. I describe each separately below.

#### 1. March 22, 2016 Meeting

Mr. Baldeo testified that he attended a Council meeting on March 22, 2016 where he accused the Council of "[h]aving their own demons." (*Id.* at

---

Compl. = Complaint (DE 1)

Def. Brf. = Defendants' Brief in Support of their Motion for Summary Judgment (DE 39-5)

Opp. = Baldeo's Opposition to Defendants' Motion for Summary Judgment (DE 43)

Pl. SMF = Plaintiff's Statement of Material Facts in Opposition to Summary Judgment (DE 43-1)

Baldeo Dep. = Transcript of Deposition of Sirrano Baldeo, Ex. B to Defendants' Motion for Summary Judgment (DE 39-7)

Mtg. Tr. = Transcript of April 5, 2016 Special Meeting, Ex. J to Defendants' Motion for Summary Judgment (DE 39-15)

McKoy Decl. = Certification of William McKoy (DE 39-2)

Video 1 = Part. 1, Video of April 7, 2016 Meeting, Ex. K to Defendants Motion for Summary Judgment (DE 39-16)

Video 2 = Part. 2, Video of April 7, 2016 Meeting, Ex. L to Defendants Motion for Summary Judgment (DE 39-17)

142:9–43:2.) After that statement, he was removed from the Council Chamber and prevented from speaking further. (*Id.* at 150:4–51:4.)[3]

### 2. April 5, 2016 Meeting

Mr. Baldeo attended an April 5, 2016 special meeting of the Council. The meeting was led by Council President William McKoy and was confined to certain topics, such as school drop-off zones. (Mtg. Tr. at 3:23–7:10.) One portion of the meeting was dedicated to public comment. (McKoy Decl. ¶ 2.) The Council usually circulated a sign-up sheet prior to meetings for members of the public who wished to speak. The Council would then recognize those individuals during the public comment period. (*Id.*)

For this meeting, no one had signed the sheet, so at one point President McKoy asked if any members of the public wished to address any of the designated topics. (Mtg. Tr. at 16:15–18:8.) A Paterson resident named Ernest Rucker indicated his desire to speak, and President McKoy recognized him. (*Id.* at 18:9–14.) Mr. Rucker stated that Mr. Baldeo had written negative things about him, and he criticized Mr. Baldeo's actions against the Council. (*Id.* at 18:13–20:23.)

When Mr. Rucker finished, he indicated that someone else, a Mr. Donald Lynch, wanted to speak. Mr. Baldeo interjected, stating "There's a few things I have to say because he didn't put his hand up." (*Id.* at 20:25–21:5.) President McKoy nonetheless recognized Mr. Lynch, who made similar criticisms of Mr. Baldeo. (*Id.* at 21:8–22:24.)

When Mr. Lynch finished, President McKoy moved to close the public portion of the meeting. (*Id.* at 22:25–23:1.) Mr. Baldeo again spoke up and said, "I have to speak, sir." (*Id.* at 23:2.) But the Councilmembers moved forward with a roll call vote to close the public portion, with all voting in favor. (*Id.* at 23:3–24:3.) The public portion was closed, and no members of the public spoke again. (*Id.*)

---

[3]     Besides Mr. Baldeo's deposition testimony, no other evidence was submitted as to what occurred at this meeting.

### 3. April 7, 2016 Meeting

Mr. Baldeo attended and attempted to film an April 7, 2016 meeting. In the Council Chamber, there is a rail, much like that in a courtroom, that separates the Councilmembers' bench from the public seating. (Video 1 at 0:00–1:00.) Mr. Baldeo placed his camera on that rail, and President McKoy repeatedly instructed him prior to the start of the meeting that, although he could film, he was not permitted to set his camera up on the railing. (*Id.*) President McKoy explained that it had long been the policy of the Chamber that nothing from the public was to be set on the rail (paper, food, etc.). (*Id.*)

As the meeting went on, Mr. Baldeo failed to comply, so President McKoy instructed the police officer in the Chamber that Mr. Baldeo could either comply with his requests or be escorted out. (Video 2 at 9:00–15.) The officer approached Mr. Baldeo and spoke with him. (*Id.* at 9:15–30.) During that conversation, President McKoy stated that he was not requesting that Mr. Baldeo stop filming, only that he remove the camera from the railing. (*Id.* at 9:45–52.) When Mr. Baldeo continued to debate with the officer, President McKoy asked that he be removed. (*Id.* at 10:45–50.) Mr. Baldeo then left the Chamber. (*Id.* at 11:30–12:00.)

### 4. Newspaper Removal

City Hall has a dedicated space on the first floor where the public may leave newspapers for distribution. (McKoy Decl. ¶ 5.) Mr. Baldeo alleges that President McKoy removed his newspapers from City Hall. (Compl. ¶ 17.) He states that he left his newspaper outside the Council Chamber on the third floor, and that before the April 7 meeting, President McKoy took those copies and placed them in the trash. (*Id.* ¶ 18; Pl. SMF ¶ 73.) President McKoy states that he did not direct anyone to remove Mr. Baldeo's newspapers and that he "did not remove all of [Mr. Baldeo's] newspapers from City Hall." (McKoy Decl. ¶¶ 6–7.)

### 5. Police Protection Request

Following these events, Mr. Baldeo alleges that he wrote a letter to the Paterson Police Department and Mayor's Office requesting individual police protection at future meetings. No one responded to his request, and he stopped going to meetings out of fear for his personal safety. (Compl. ¶¶ 23–25; Baldeo Dep. at 176:2–10; DE 39-6 ¶ 16.) Nonetheless, police officers are usually present at Council meetings. (*See* Video 2 at 9:00–15.)

### 6. "Ban" on Receiving Notices

Mr. Baldeo alleges that the Council provides notices and information about meetings to local newspapers, but removed his newspapers from the distribution list in retaliation. (Compl. ¶ 27.) This claim seems to be based on the New Jersey Open Public Meetings Act ("OPMA") (*see* Baldeo Dep. at 188:23–190:1), which provides that, prior to a meeting, a public body must provide advance notice and an agenda to at least two newspapers. N.J. Stat. Ann. §§ 10:4-8(d), 10:4-9(a). For some time, the Council provided notice to multiple newspapers (more than the statutory minimum), including *The New Jersey Pulse* and *The Paterson Pulse.* (*See* Video 1 at 3:20–30.) But, according to Mr. Baldeo, the Council voted in July 2016 to remove his newspapers from the distribution list, and a clerk "informed him that the order to remove his newspaper came from the Council President McKoy." (Pl. SMF ¶ 81.) President McKoy, however, states that he never ordered that Mr. Baldeo's newspapers be "banned." (McKoy Decl. ¶ 7.)

### 7. Private Investigator

Finally, Mr. Baldeo alleges that the Council hired a private investigator, Harry Melber, to conduct surveillance of him and Mrs. Baldeo. (Compl. ¶ 34; *see also* Baldeo Dep. at 83:19–22.) However, Mr. Baldeo has not presented any evidence—in fact, he has denied possession of any—showing that the Council hired Mr. Melber. (*See* Baldeo Dep. 113:22–115:22.)

### B. Procedural History

Over two years after the first Council meeting described above, Mr. Baldeo and his wife sued the Council as well as the City attorney and business administrator (plus John Doe defendants). (Compl. ¶¶ 1–4.) The Baldeos asserted (1) a § 1983 claim for federal constitutional violations, (2) a NJCRA claim for federal and state constitutional violations, (3) a § 1985(3) claim, and (4) various tort claims. (*Id.* ¶¶ 38–82.) I dismissed the tort claims with prejudice, the claims against the City attorney and business administrator without prejudice, and the claims by Mrs. Baldeo without prejudice. *Baldeo v. City of Paterson*, Civ. No. 18-5359, 2019 WL 277600, at *1 (D.N.J. Jan. 18, 2019).

The Complaint has not been amended, so what remain are Mr. Baldeo's § 1983 and NJCRA claims against the Council (Counts 1 and 2). Those counts lump all the acts described above together and assert indiscriminately that they violate the First, Fifth, and Fourteenth Amendments to the U.S. Constitution, and Article I, Paragraphs 1, 6, and 18 of the New Jersey Constitution. (Compl. ¶¶ 37–50.) After discovery, the Council moves for summary judgment on those claims. (DE 39.)

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to

the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

## III.   DISCUSSION

I first analyze each of the Council's acts that allegedly violated Mr. Baldeo's federal constitutional rights and form the basis of his § 1983 claim. (Sections III.A–B, *infra*.) Although they are lumped together, it is convenient to refer to each as a separate constitutional claim. His briefing invokes the First Amendment as the basis for these claims, so I primarily analyze them as such. (Section III.A, *infra*.) But the Complaint, and to a minimal extent his brief, argue that the Council's acts also violated the Fifth and Fourteenth Amendments. I therefore briefly address those alternative theories. (Section III.B, *infra*.) Finding no federal constitutional violations, I then explain why the NJCRA claim also fails. (Section III.C, *infra*.)

Preliminarily, I note that the Complaint alleges its constitutional claims against "Defendants," a designation which includes the City of Paterson and all individual Councilmembers. This strategy gives rise to two potential legal difficulties.

First, a plaintiff must show that individual defendants were personally involved in violating his rights. *Cresci v. Kazan*, Civ. No. 19-19928, 2020 WL 5700754, at *2 (D.N.J. Sept. 24, 2020) (citations omitted). Most of Mr. Baldeo's alleged violations involve President McKoy, but others arise from Council meetings at which the remaining individual defendants were present. Because I

find, *infra*, that there is no underlying constitutional violation, I have not attempted to sort through each defendant's involvement in each claim.

Second, the City of Paterson can only be liable for a policy, custom, or practice. *Id.* at *4 (citations omitted). Mr. Baldeo's brief does not squarely argue that the acts taken together represent a policy, custom, or practice or that any of the Council's or President McKoy's actions could be considered a policy. *See generally Hilsenrath v. Sch. Dist. of the Chathams*, Civ. No. 18-00966, 2020 WL 6621954, at *10 (D.N.J. Nov. 12, 2020) (explaining how individual actions may qualify as a "policy"), *appeal docketed*, No. 20-3474 (3d Cir. Dec. 10, 2020). Nor is there evidence presented related to that inquiry. Once again, however, I have focused on the underlying constitutional violation, and found that there is none. As a consequence, the issue of whether liability extends to the City is moot. *See Vargas v. City of Philadelphia*, 783 F.3d 962, 974–75 (3d Cir. 2015).[4]

## A. First Amendment Claims

### 1. March 22, 2016 Meeting Claim

Mr. Baldeo alleges that his removal from the Council meeting on March 22, 2016 deprived him of his First Amendment right to speak. (Compl. ¶¶ 7–9, 37(a).) The Council responds that any claims arising from the March 22, 2016 meeting are barred by the statute of limitations.

For a § 1983 claim, the statute of limitations comes from "the underlying state's statute of limitations for personal-injury torts." *Randall v. City of Phila. Law Dep't*, 919 F.3d 196, 198 (3d Cir. 2019). In New Jersey, that period is two years. N.J. Stat. Ann. § 2A:14-2(a). Likewise, Mr. Baldeo's NJCRA claim is subject to a two-year statute of limitations. *E.g.*, *Smith v. Datla*, 164 A.3d 1110, 1120 (N.J. Super. Ct. App. Div. 2017). Two years from March 22, 2016 was

---

[4]   My earlier opinion held that the Complaint alleged a municipal liability claim. *Baldeo*, 2019 WL 277600, at *14. But now Mr. Baldeo has the burden to point to some evidence in the record and present arguments to support his claim of municipal liability. *See NAACP v. City of Philadelphia*, 834 F.3d 435, 440 (3d Cir. 2016) (citation omitted). He has not done so.

March 22, 2018. Mr. Baldeo filed his Complaint on April 3, 2018, just a few days late, but late nonetheless.

Mr. Baldeo replies that his claims relating to the March 22, 2016 meeting are not untimely by virtue of the continuing violation doctrine. (Opp. at 10.) Under that doctrine, recognized under both federal and New Jersey law, when a plaintiff is injured by "continual" conduct by the defendant, the limitations period continues with the conduct. *Randall*, 919 F.3d at 198; *Roa v. Roa*, 985 A.2d 1225, 1231 (N.J. 2010). In other words, if the Council's conduct at the March 22, 2016 meeting could be considered part of the later conduct that forms the basis for his other claims, then claims arising from the March 22, 2016 meeting would be considered timely. *See id.*

But the continuing violation doctrine does not allow a plaintiff to string together multiple "discrete acts" or "individually actionable allegations." *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006); *accord Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 938 (3d Cir. 2011) (applying New Jersey law). Put differently, "causes of action that can be brought individually expire with the applicable limitations period." *O'Connor*, 440 F.3d at 128. Mr. Baldeo's claim of deprivation of First Amendment rights, to the extent it is based on the March 22, 2016 meeting, is not dependent on any other conduct. He does not dispute that he could have brought that claim "individually." Recasting the claim as one of First Amendment retaliation would not assist him; the Third Circuit has explicitly held that "First Amendment retaliation claims are always individually actionable, even when relatively minor." *Id.* at 127–28. Thus, the continuing violation doctrine cannot save Mr. Baldeo's claim based on the March 22, 2016 meeting from being time-barred.

The Council is entitled to summary judgment on the March 2, 2016 component of the federal and state constitutional claims, which is time-barred.

### 2. April 5, 2016 Meeting Claim

Mr. Baldeo contends that, by denying him a chance to speak at the April 5, 2016 meeting, the Council violated the First Amendment. Such a violation

may occur when government bodies prevent members of the public from speaking at open government meetings. *Galena v. Leone*, 638 F.3d 186, 197 (3d Cir. 2011). To determine whether a violation has occurred here, where the alleged violation occurred on government property, I use a three-part test. *Turco v. City of Englewood*, 935 F.3d 155, 161 (3d Cir. 2019). I must (1) "determine whether the First Amendment protects the speech at issue," (2) decide what type of forum is involved, and (3) "resolve whether the government's justifications for exclusion from the relevant forum satisfy the requisite standard." *Id.* at 161–62 (quotation marks, alterations, and citations omitted).

On the first prong, there is no dispute that Mr. Baldeo's intended speech at the meeting was protected. A newspaper editor, he habitually speaks on matters of public concern, and there is no indication that he intended to say anything "obscene, geared towards the incitement of violence, or libelous." *Porter v. City of Philadelphia*, 975 F.3d 374, 386 (3d Cir. 2020).

On the second prong, "[t]here are three types of protected forums for speech occurring on government owned or controlled property." *Id.* Those types of forums are (1) a traditional public forum, (2) a designated public forum, and (3) limited public forum (also called a nonpublic forum). *Id.* The parties agree that the Council meeting was a limited public forum. (Def. Brf. at 9; Opp. at 10.) Indeed, a limited public forum is "a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Porter*, 975 F.3d at 386. Because municipal council meetings are held for the "limited purpose" of governing the municipality and discussing "topics related to that governance," the Council meeting here was a limited public forum. *Galena*, 638 F.3d at 199.

On the third prong, I apply the legal test that corresponds with the forum. A limited public forum "is entitled to lesser First Amendment protection than the other two forums. Accordingly, the government is allowed 'much more flexibility to craft rules limiting speech.'" *Porter*, 975 F.3d at 387 (quoting *Minn.*

*Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018)). "The government may reserve such a forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Mansky*, 138 S. Ct. at 1885 (quotation marks and citation omitted).

The Council argues that it reasonably prevented Mr. Baldeo from speaking because (1) he did not use the sign-up sheet for speakers, and (2) allowing him to respond to Rucker and Lynch would have let him "hijack[]" the meeting and turn it away from the designated subject matter. (Def. Brf. at 11–12.) In response, Mr. Baldeo does not seem to take issue with the principle that the sign-up sheet, in general, is a reasonable restriction. Rather, he argues that, once the Council allowed Rucker and Lynch to speak, he should have been given the same opportunity. (Opp. at 11.) Denial of that opportunity, he suggests, constituted viewpoint discrimination. (*See id.* at 11–12.)

For two reasons, there is no basis from which a juror could conclude that there was viewpoint discrimination here.[5] First, when Mr. Baldeo asked to

---

[5]    I focus on viewpoint discrimination as the key issue in this case because the correct test for a limited public forum otherwise seems to be in flux. In *Galena*, the Third Circuit explained that the government can impose a "time, place, and manner restriction" on speech in such a forum if the restriction is "(1) content-neutral, (2) narrowly tailored to serve an important governmental interest, and (3) leaves open ample alternatives for communication of information." 638 F.3d at 199. In *Porter*, the district court relied on *Galena* and applied this three-part test to restrictions imposed at a limited public forum. 337 F. Supp. 3d 530, 550 (E.D. Pa. 2018). The Third Circuit reversed, holding that the Supreme Court in *Mansky* indicated that the time, place, and manner test does not apply in limited public forum cases. 975 F.3d at 387–88. Instead, the test is simply whether restrictions in a limited public forum are reasonable and viewpoint neutral. *Id.* Yet the *Porter* court neither expressly held that *Mansky* abrogated *Galena* nor explained how *Galena* was distinguishable.

I need not attempt to reconcile *Galena* and *Porter*. *Galena* also explained that "even if a limitation on speech is a reasonable time, place, and manner restriction, there is a First Amendment violation if the defendant applied the restriction because of the speaker's viewpoint." 638 F.3d at 199. Likewise, *Porter* held that a restriction in a limited public forum will fail if not viewpoint neutral. Thus, whether or not the time, place, and manner test applies here, if the Council's enforcement of its restrictions

speak, he did not proffer a viewpoint (let alone one related to the subject of the meeting), and no such evidence apparently emerged in discovery, so there is no basis to infer viewpoint discrimination.

In *Galena*, an exchange at a town meeting unfolded similarly to that here: An attendee spoke out of order by stating "I have an objection," and the council prevented him from speaking because that portion of the meeting was not open for public comment. 638 F.3d at 206. The Third Circuit held that there was no basis to infer viewpoint discrimination because the attendee never indicated his viewpoint (the basis for his objection) before the council declared him out of order. *Id.* Likewise, Mr. Baldeo only indicated his desire to speak but not his viewpoint. (Mtg. Tr. at 20:25–21:5 ("There's a few things I have to say because he didn't put his hand up."); *id.* at 23:2 ("I have to speak, sir.").) As a result, under *Galena*, a reasonable juror could not infer viewpoint discrimination.[6]

Second, Mr. Baldeo has pointed to no authority—and I could locate none—for the proposition that once a meeting attendee speaks out of order, the presiding body must allow any other meeting attendee who wishes to speak out of order to do so, or otherwise be liable for viewpoint discrimination. To the contrary, the Third Circuit has recognized in multiple opinions that a government body is empowered to prevent attendees from hijacking the meeting or spurring a devolution into irrelevant matters, like personal

---

was not viewpoint neutral, as Mr. Baldeo contends, then there is a First Amendment violation.

[6] To be sure, Mr. Baldeo had previously attended meetings and presented his views, so perhaps one could infer that his speech would have presented similar views to those he expressed in the past. But the *Galena* court acknowledged that the attendee there had a similar history, and the court still found no reasonable inference of viewpoint discrimination. 638 F.3d at 208. That is, there is nothing in the transcript of the meeting to indicate that President McKoy or the Council considered Mr. Baldeo's past comments in that moment and closed the public portion of the meeting because of those comments. Quite the opposite—the exchange happened so quickly that no reasonable juror could conclude that the Council had the time to form the requisite intent to suppress Mr. Baldeo's speech.

grievances. *Galena*, 638 F.3d at 211 ("[I]f a member of the public at the Hearing of the Public portion of a Council meeting wanted to discuss his child's birthday party, the proposed speech . . . would be so far removed from the business of the meeting, or the Council's or County's business in general, that the chairperson could suppress the speech without raising First Amendment issues."); *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004) (government body is not required "to allow a speaker to try to hijack the proceedings, or to filibuster them"); *Olasz v. Welsh*, 301 F. App'x 142, 146 (3d Cir. 2008) (no viewpoint discrimination when enforcing decorum rules).

That is precisely what happened here. When President McKoy recognized Mr. Rucker and then Mr. Lynch, it became clear that the public portion of the meeting was quickly devolving into criticism of Mr. Baldeo. So McKoy closed the public portion. No constitutional rule prevented President McKoy from bringing the meeting back to order, or required that Mr. Baldeo be afforded a right to reply to his critics on matters not directly relevant to the agenda. For those permissible purposes, a certain amount of speech may be suppressed in this limited public forum. *See Galena*, 638 F.3d at 211.

The case most favorable to Mr. Baldeo's position is probably *Monteiro v. City of Elizabeth*, 436 F.3d 397 (3d Cir. 2006), but *Monteiro* does not ultimately assist him. At that council meeting, a council president launched a personal attack at another councilmember and, eschewing proper procedure, ejected the councilmember when he tried to respond. *Id.* at 400–02. The Third Circuit held that there was a genuine issue of fact as to whether the president ejected the member because of his viewpoint. *Id.* at 405. The court explained that the president's failure to follow procedure or consult her fellow councilmembers tended to show that her motivation sprang from personal animus, not a desire to maintain decorum. *Id.* at 405–06.

*Monteiro* does have much to say about what facts may create an inference of viewpoint discrimination, as opposed to enforcement of an agenda or principles of decorum. But *Monteiro* does not sway my conclusions here, for

two reasons. First, *Monteiro* is factually distinguishable. *Monteiro* involved actions by a council president against another councilmember. Accordingly, the well-recognized power to control the subject of a public portion of a meeting is not at play. Moreover, the *Monteiro* court weighed heavily the fact that the council president abandoned procedure or consultation with other members. Here, by contrast, President McKoy's decision not to call on Mr. Baldeo represents an attempt to *enforce* proper procedure, not to subvert the council's collective functioning, and the entire council voted on the motion to close the public portion.

Second, *Monteiro's* status as binding precedent appears doubtful. The majority opinion in *Monteiro* was authored by Judge Rosenn and joined by only one other panel member (Judge Sloviter); Judge Fisher dissented. A footnote at the beginning of the opinion states the sad fact that Judge Rosenn died prior to the issuance of the opinion. Recently, the Supreme Court held that the vote of a court of appeals judge who died prior to issuance of a decision cannot be counted to reach a majority. *Yovino v. Rizo*, 139 S. Ct. 706, 709–10 (2019) (per curiam). Without Judge Rosenn's vote, the *Monteiro* opinion is supported by one judge, over the dissent of another, so it does not represent a majority opinion.[7] Under *Yovino,* then, *Monteiro* is without force.

---

7      *Yovino* actually occurred in the context of a decision *en banc*. It relied, however, on a body of case law regarding three-judge panels:

> [A]court of appeals case may be decided by a panel of three judges, and therefore on such a panel two judges constitute a quorum and are able to decide an appeal—provided, of course, that they agree. Invoking this rule, innumerable court of appeals decisions hold that when one of the judges on a three-judge panel dies, retires, or resigns after an appeal is argued or is submitted for decision without argument, the other two judges on the panel may issue a decision if they agree. [Citing, *inter alia, Singh v. Ashcroft*, 121 F. App'x 471, 472 (3d Cir. 2005)] With the exception of one recent decision issued by the Ninth Circuit after Judge Reinhardt's death but subsequently withdrawn . . . , we are aware of no cases in which a court of appeals panel has purported to issue a binding decision that was joined at the time of release by less than a quorum of the judges who were alive at that time.

14

For the foregoing reasons, the Council is entitled to summary judgment on Mr. Baldeo's claim that the Council violated the First Amendment by denying him a chance to speak at the April 5, 2016 meeting.

### 3. April 7, 2016 Meeting Claim

Mr. Baldeo alleges that the Council violated the First Amendment by preventing him from filming and removing him from the April 7, 2016 meeting. (Compl. ¶ 19–22.) This claim, too, must be denied on summary judgment.

First, there is no unqualified First Amendment right to film government meetings. Rather, a court must consider whether a restriction on filming "meaningfully interfere[s] with the public's ability to inform itself about [the meeting]." *Reed v. Barnard*, 976 F.3d 302, 307 (3d Cir. 2020) (citing *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 183 (3d Cir. 1999)).[8] Even an outright prohibition on filming may be permitted where, as here, alternative means were available for Mr. Baldeo or the public to inform themselves about the meeting—for example, by attending and taking notes. Such alternatives foreclose a First Amendment claim. *Id.* at 307–08.

Be that as it may, the evidence is undisputed that there *was* no meaningful interference with filming here. Mr. Baldeo was never prohibited from filming; he was just instructed not to place his camera and tripod on the railing. (Video 1 at 0:00–1:00; Video 2 at 9:45–52.) A reasonable instruction on camera placement does not meaningfully interfere with any First Amendment right to access a meeting. And, for what it is worth, the railing rule appears to

---

139 S. Ct. at 709–10 (citing 28 U.S.C. § 46(c) & (d) (quorum rules)).

[8] New Jersey recognizes a common-law right to film public meetings, and the standard is different from the Third Circuit's for a First Amendment claim. *See Tarus v. Borough of Pine Hill*, 916 A.2d 1036, 1047–48 (N.J. 2007). But the result here is unchanged. Mr. Baldeo only brings constitutional claims, but the common law right to film public meetings is not based on any provision in the New Jersey Constitution. *Id.* at 1047. Because a common-law claim is not alleged in the Complaint, it cannot be a basis for relief. *Berrada v. Cohen*, 792 F. App'x 158, 161 n.3 (3d Cir. 2019). Moreover, Mr. Baldeo's brief does not invoke the common-law claim. (Opp. at 13.)

have been content-neutral with respect to First Amendment rights; it applied not just to cameras or notebooks, but to all items, including food and papers.

Second, Mr. Baldeo's removal after failing to comply with the Council's requests does not give rise to a First Amendment claim. A presiding officer may constitutionally remove a meeting participant who fails to comply with reasonable rules of decorum. *See Galena*, 638 F.3d at 211; *Eichenlaub*, 385 F.3d at 282; *Olasz*, 301 F. App'x at 146. Accordingly, summary judgment is granted to the Council as to the claim arising from the April 7, 2016 meeting.

### 4. Newspaper "Dumping" Claim

Mr. Baldeo alleges that President McKoy violated the First Amendment by removing his newspapers from City Hall. (Compl. ¶ 17.) This claim fails on summary judgment, for two reasons.

First, Mr. Baldeo has produced no evidence in support of this claim. Instead, his statement of facts copies the allegations from his Complaint; it contains no citations to any evidence. (Pl. SMF ¶ 73.) At the summary judgment stage, a party "may not rest upon the mere allegations . . . of his pleadings" but "must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice." *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014). Because Mr. Baldeo has not so much as attempted to carry his burden, there is no basis to deny the Council's motion.

Second, the limited facts in the record support granting summary judgment in the Council's favor. Municipal government buildings, like Paterson City Hall, are generally considered nonpublic fora. *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 966 (9th Cir. 2002); *Summumm v. City of Ogden*, 297 F.3d 995, 1002 (10th Cir. 2002); *see Make the Road by Walking Inc. v. Turner*, 378 F.3d 133, 145–46 (2d Cir. 2004) (welfare office waiting rooms).[9]

---

[9]     Forum classification is highly specific. A Council meeting is, and is intended to be, a forum for public comment, subject to restrictions. City Hall, however, is also a place where the administrative and executive business of government is conducted.

Accordingly, the Council may reasonably regulate speech therein. *See Manksy*, 138 S. Ct. at 1885. President McKoy's declaration, the only evidence on this claim, states that there is a designated area in City Hall where newspapers may be placed. Mr. Baldeo placed his newspapers outside that designated area. President McKoy removed those misplaced copies, but not all copies within City Hall. (McKoy Decl. ¶¶ 6–7.)

There is no evidentiary dispute that President McKoy was enforcing reasonable restrictions on where the public may place materials within City Hall, and Mr. Baldeo makes no argument that such reasonable restrictions violate the First Amendment. Summary judgment is therefore granted to the Council on this claim.

### 5. Police Protection Claim

Mr. Baldeo claims that the City violated his constitutional rights by failing to honor his demand for personal police protection at Council meetings. That claim fails for three reasons. (Compl. ¶¶ 23–25.)

First, his brief does not defend that claim at all, so he forfeits the claim. *Yates Real Estate, Inc. v. Plainfield Zoning Bd. of Adjustment*, 404 F. Supp. 3d 889, 913 n.28 (D.N.J. 2019); *see Moeck v. Pleasant Valley Sch. Dist.*, 844 F.3d 387, 390 (3d Cir. 2016) ("[T]he failure of a party to oppose a motion will indicate that the motion is in fact not opposed, particularly if the party is represented by an attorney . . . ." (citation omitted)). Second, neither his Complaint nor brief indicate which constitutional right the denial of police protection violates.[10] *See Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017)

---

Thus a Council meeting may occupy a different status from City Hall, and specific locations within a government building may required their own forum analysis.

[10]     Mr. Baldeo points to no constitutional right to be assigned a personal police bodyguard, particularly where the police are routinely present at Council meetings for the purpose of keeping order. *Cf. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (holding that the Due Process Clause does not confer an affirmative right to government protection). Nor is there a claim of discrimination on an unconstitutional basis; there is no allegation, for example, that others received police protection under similar circumstances.

("[T]he threshold inquiry in a § 1983 suit . . . requires courts to identify the specific constitutional right at issue." (quotation marks and citation omitted)). Third, he alleges that the Police Department and the Mayor denied his request, but neither is a defendant. It appears that none of the named defendants was involved in the constitutional deprivation, if that is what it was. *Cresci v. Kazan*, Civ. No. 19-19928, 2020 WL 5700754, at *2 (D.N.J. Sept. 24, 2020).

Summary judgment is granted to the Council on the constitutional claim of denial of police protection.

### 6. Newspaper "Banning" Claim

Mr. Baldeo alleges that, by removing his newspapers from the list of newspapers that receive notices and information about meetings, the Council violated the First Amendment. (Compl. ¶ 27.) His specific First Amendment theory is unclear. The Complaint merely states that this action, along with the Council's other acts, violated his right to free speech. (*Id.* ¶ 44.) Other allegations suggest that he raises a First Amendment retaliation claim. (*Id.* ¶¶ 27, 37(b).) His brief, however, argues only that the removal of his newspapers from the distribution list violated the right to a free press. (Opp. at 15.) Regardless of the theory, summary judgment must be granted to the Council on this claim.

A retaliation claim requires "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising [his] constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*, 971 F.3d 416, 429 (3d Cir. 2020) (citation omitted). Assuming that his speech at Council meetings and opinions in his newspapers is "constitutionally protected conduct," Mr. Baldeo has failed to produce evidence on the second and third elements. The only evidence I may consider on this claim is President McKoy's declaration. *See* Fed. R. Civ. P. 65(c)(1)(A) ("affidavits or declarations" may be considered on summary

judgment).[11] In that declaration, McKoy states that he did not order the removal of Mr. Baldeo's newspapers from the list. (McKoy Decl. ¶ 7.) Accordingly, the record refutes the Complaint's allegation that President McKoy ordered the removal of Mr. Baldeo's newspapers (the retaliatory action) or that, if he or the Council did so, Mr. Baldeo's speech was the "but for" reason for the removal (causation). *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (but-for causation required). Any retaliation claim has not been sustained by evidence.

Mr. Baldeo may be making a right of access claim. It is true that the First Amendment guarantees both the press and the people the right to access certain information from the government, but that right is "qualified and subject to limitations." *PG Pub. Co. v. Aichele*, 705 F.3d 91, 98 (3d Cir. 2013). Mr. Baldeo has pointed to no authority, and I could locate none, for the proposition that this right of access means that the government must publish its notices in any particular newspaper (or in all newspapers). Indeed, it is hard to see how the right of access is abridged at all here. The information at issue is still available and publicly disseminated, just not through Mr. Baldeo's newspapers. If Mr. Baldeo's "newspaper ban" claim is based on the right of access, it fails.

### 7. Private Investigator Claim

Mr. Baldeo's claim that the Council hired a private investigator to conduct surveillance of him and Mrs. Baldeo likewise must be denied on summary judgment, for lack of evidence. (Compl. ¶ 34.)

Mr. Baldeo has presented no evidence to show that Council hired an investigator at all. He has not shown involvement by any of the defendants in

---

[11]   Mr. Baldeo's statement of facts parrots his Complaint and states that a city clerk told him that President McKoy ordered the removal in retaliation. (Pl. SMF ¶ 81.) This statement is not supported by record citations or a separate affidavit, so I will not consider it. *See* Fed. R. Civ. P. 65(c)(1)(A); L. Civ. R. 56.1(a). Even if I construed the statement of facts as an affidavit from Mr. Baldeo, the clerk's statement would be at least single hearsay, and Mr. Baldeo has made no attempt to "explain the admissible form" the statement could take, so it need not be considered. *See Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 237 (3d Cir. 2016) (citation omitted).

the claimed surveillance. *Cresci*, 2020 WL 5700754, at *2. All he offers is his own testimony that he suspected an investigator, Melber, was hired by the Council. He acknowledges that he has no documents or facts regarding the identity of Melber's client. (*E.g.*, Baldeo Dep. at 113:22–115:22.) Assuming that he was surveilled by Melber, he has offered no evidence based on personal knowledge as to who hired Melber. *See D.E.*, 765 F.3d at 268–69 ("[S]uspicions will not suffice."); *NLRB v. FES, a Div. of Thermo Power*, 301 F.3d 83, 95 (3d Cir. 2002) ("Roche's testimony . . . amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment.").

Summary judgment is granted to the Council on the claim regarding surveillance by a private investigator.

## B. Fifth and Fourteenth Amendments Claims

Mr. Baldeo asserts the alternative theory that all the Council's conduct described above also violated his rights under the Fifth and Fourteenth Amendments. (Compl. ¶¶ 40, 44, 46.) Those Amendments confer many rights, but his Complaint specifically refers the rights to substantive due process and equal protection. (*Id.* ¶¶ 44, 46.)

At the outset, his brief does not mention the Fifth Amendment or the right to equal protection, so he has forfeited those claims. *See Yates*, 404 F. Supp. 3d at 913 n.28. Regardless, a Fifth Amendment claim would fail because that provision's guarantees of due process and equal protection only constrain federal actors, not state and local actors like the Council. *See Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954) (equal protection); *Nguyen v. U.S. Catholic Conf.*, 719 F.2d 52, 54 (3d Cir. 1983) (per curiam) (due process). A Fourteenth Amendment equal protection claim would likewise fail. He has not alleged differential treatment on the basis of a classification. *See Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012). To the extent he may be asserting a "class-of-one" claim, he has not alleged that the Council treated similarly

situated persons (*e.g.*, other disruptive attendees) differently. *See Phillips v. County of Allegheny*, 515 F.3d 224, 243 (3d Cir. 2008).

The doctrine of "substantive due process" rests on the principle that the Fourteenth Amendment "liberty" carries with it a level of protection from certain shocking abuses of government power. *Porter v. Pa. Dep't of Corrs.*, 974 F.3d 431, 447 (3d Cir. 2020). That is, "[t]he substantive component of the Due Process Clause" is "violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience." *Id.* (citation omitted). Nonetheless, "if a constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Id.* (citation omitted).

As the above discussion shows, Mr. Baldeo contends that the Council's actions all violate the First Amendment. His claims are self-evidently "covered by a specific constitutional provision." *Id.* He does not point to "distinct facts" that would support a separate, substantive due process claim based on the same allegations. *Id.* at 448. Accordingly, any substantive due process claim relying on the same conduct must be denied. *Id.*; *see also Armbruster v. Cavanaugh*, 410 F. App'x 564, 567 (3d Cir. 2011) (substantive due process claim failed when plaintiff alleged that conduct violated the First Amendment).[12]

### C. NJCRA Claim

Count 2 is brought under the NJCRA. It repeats that the Council's conduct violated Mr. Baldeo's federal constitutional rights, and adds that it

---

[12] Even if I were to analyze whether the Council's conduct violated substantive due process, such a claim would fail. No reasonable juror could find that the Council's conduct shocked the conscience, as this case stands far afield of cases where courts have recognized a violation of substantive due process. *Compare Kane v. Barger*, 902 F.3d 185, 194 (3d Cir. 2018) (police officer investigating sexual assault inappropriately touched victim and photographed her intimate bodily areas with his personal cell phone for his own gratification).

violated "corresponding rights guaranteed by the New Jersey State Constitution, Article I, [Paragraphs] 1, 6, and 18." (Compl. ¶ 49.) The NJCRA allows a plaintiff to seek relief for deprivations of federal and state constitutional rights. *Perez v. Zagami, LLC*, 94 A.3d 869, 875 (N.J. 2014). When a plaintiff brings an NJCRA claim for violations of federal rights, the analysis for an NJCRA claim and a § 1983 claim is precisely the same. *E.g.*, *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443–44. (D.N.J. 2011). Because Mr. Baldeo's federal constitutional claims must be denied, so too must his corresponding claims under the NJCRA.

To the extent his NJCRA claim is based on the New Jersey Constitution, it must be denied. First, Mr. Baldeo's brief does not so much as reference Paragraph 1, which protects due process and equal protection rights, at all, so any such claim is forfeited. *Yates*, 404 F. Supp. 3d at 913 n.28. Although his brief mentions Paragraphs 6 and 18, which protect the rights of free speech, press, and petition, those rights are interpreted co-extensively with their federal counterparts with a "few exceptions." *E & J Equities, LLC v. Bd. of Adjustment of the Twp. of Franklin*, 146 A.3d 623, 634 (N.J. 2016) (speech); *Turner v. N.J. State Police*, Civ. No. 08-5163, 2017 WL 1190917, at *21 (D.N.J. Mar. 29, 2017) (petition); *Farneski v. County of Hunterdon*, 916 F. Supp. 2d 573, 582 n.10 (D.N.J. 2013) (same); *see In re Att'y Gen.'s "Directive on Exit Polling: Media & Non-Partisan Pub. Interest Grps."*, 981 A.2d 64, 80 n.12 (N.J. 2009) (press); *N.J. Press Ass'n v. Guadagno*, Civ. No. 12-06353, 2012 WL 5498019, at *4 & n.3 (D.N.J. Nov. 13, 2012) (same). Mr. Baldeo's brief does not cite any such "exception" or explain how the analysis or result for his New Jersey constitutional claims should differ from that for his federal claims. He merely remarks generally that his state rights are "broader." That is insufficient. *See Matrix Distribs. v. Nat'l Ass'n of Bds. of Pharm.*, Civ. No. 18-17462, 2020 WL 7090688, at *8 n.10 (D.N.J. Dec. 4, 2020) (passing references in a brief are insufficient to raise a legal theory (citation omitted)); *Watson v. Christo*, --- F.

App'x ---, No. 19-2737, 2020 WL 7054443, at *1 n.4 (3d Cir. Dec. 2, 2020) (failure to raise and argue state constitutional claim rendered it forfeited).[13]

Mr. Baldeo has furnished no substantial basis for the Court to conclude that his state constitutional claims should prevail even where his federal claims did not. Summary judgment is granted to the Counil on Count 2.

## IV.    CONCLUSION

For the reasons set forth above, the Council's motion for summary judgment is granted. A separate order will issue.

Dated: December 31, 2020

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**

---

[13]    Forfeiture aside, the "few exceptions" the New Jersey Supreme Court has recognized in which the New Jersey Constitution is broader than the federal Constitution would not apply here. *E & J Equities*, 146 A.3d at 634. One exception is that the New Jersey right to free speech does not require government action, as the right also constrains private entities. *Mazdabrook Common Homeowners' Ass'n v. Khan*, 46 A.3d 507, 514 (N.J. 2012). But only government actors are sued here. Another exception is that the New Jersey Constitution provides greater protection to certain speech against defamation suits. *W.J.A. v. D.A.*, 43 A.3d 1148, 1155–56 (N.J. 2012). But Mr. Baldeo is not the subject of a defamation claim here.